YARRUT, Judge.
This is an appeal by Defendants from a judgment in favor of Plaintiff, awarding Plaintiff Workmen’s Compensation for temporary total disability, plus statutory penalties and attorney’s fee. Defendants are the employer and its compensation liability insurer.
The judgment of the District Court is for $35.00 per week, not to exceed 400 weeks, plus 5'% interest on past due installments, subject to credit for $3120.00 representing 96 weeks’ payment at $32.50 per week; plus 12% and $1900.00 attorney’s fee as penalties, the penalty being assessed against Defendant-insurer alone.
Plaintiff suffered a back injury while working as a plumber’s helper in an attic of a residence for his employer. There is no dispute about the hazardous character of the employment and that Plaintiff’s work was that of a laborer, lifting heavy objects, climbing and stooping. Plaintiff’s background and employment history, and medical treatment, is reflected by the record as follows:
Plaintiff entered the Military Service at the age of 18; was married at the age of 19; now has seven children. He went to work after Military Service, later re-entered the Army for a little over two years; and worked ever since until his injury on April 22, 1959, as a laborer, in jobs in oil field maintenance, pipe line work, plumbing, etc. He went to work for Defendant-employer as an apprentice plumber about seven weeks before his injury. He has always been healthy, though several years ago he was told he had stomach ulcers. He suffered a broken finger and later his right knee was operated on for broken knee cartilage. On April 22, 1959, while pulling on a wrench in a sitting position, he experienced a sudden severe pain in the lower back, at the level of the belt. On arrival at the doctor’s office he was experiencing pain, soreness, and stiffness of the lower back, and was given treatments for about one week. Because he was not improving he was referred to orthopedist Dr. Bat-talora, who made X-rays of the lower back and started a series of treatments. While he was under Dr. Battalora’s care the pain in the back spread into the right lower extremity. Dr. Battalora released him in September 1959, though Plaintiff continued to complain of back and right lower extremity pain. After his release by Dr. Bat-talora, he consulted an attorney who, in turn, sent him to orthopedist Dr. Unkauf. Dr. Unkauf treated him for sixteen days by means of traction; eventually made a myelogram and performed a laminectomy on his fourth lumbar intervertebral disc in December 1959. This operation improved his back and leg pain until February 1960, when he experienced a sudden return of the low back pain while getting out of bed. In April 1960, he again experienced a sudden return of the back pain when walking upstairs. He was in touch with Dr. Unkauf through 1960. In February 1961, he was in fair shape and was released for light work, which he was unable to find. In June or July, 1961, he returned to Dr. Unkauf because of back and right lower extremity pain. He last saw Dr. Unkauf at the end of September 1961. He has not done any work since the accident of April 22, 1959.
The only question is whether Plaintiff has fully recovered from his injury and the laminectomy. Defendants contend that Plaintiff recovered from the laminectomy to L-4 (4th lumbar disc) and his present *77 trouble emanates from Li-5 (5th lumbar ■disc), not sustained in the initial injury, but through some intervening cause, unconnected with his employment. This issue must necessarily depend upon the expert medical testimony, Dr. Unkauf for Plaintiff, and Dr. Echols for Defendants.
Dr. Byron M. Unkauf, orthopedic specialist, testified:
“Well, I feel that in view of this that one should consider the fact that the patient, who had made a reasonably good recovery from his first lami-nectomy and was discharged on January 26, 1961, has now returned with a recurrence of his pain and suggestive findings on the myelogram of a protrusion of the fifth lumbar disc on the left side. The degree of protrusion is slight, but I feel that his symptoms are severe and prevent him from attempting gainful employment and that an effort should be made to relieve him of this discomfort. It would, therefore, be my suggestion that an exploratory laminectomy be carried out on the left side at the fifth interspace in an •effort to relieve him of his discomfort.”
* * * * * *
"Well, the only thing I know about that is I have no idea what has brought that about, but I do know it was not there on the myelogram of 1Z-3-59, so it has occurred — whatever has caused it in that interval. I would say, from the man’s history and clinical findings, that it has occurred since he was discharged. This never was enough to warrant suggesting the second myelo-gam, all during the period up until he was discharged in January of 1961. That was not warranted in suggesting it until his return in August, and September of this year.”
Dr. Dean H. Echols, for Defendants, an -expert in neurosurgery, testified:
“Q. Doctor, did you reach any conclusion concerning this man’s physical status ?
■ “A. • I came to the conclusion that everything the patient had told me was compatible with a diagnosis of rupture of an already degenerated fourth lumbar or fifth lumbar intervertebral disc on April 22, 1959. However, Dr. Bat-talora may have had good reasons for not making that diagnosis, if it is true that he did not make that diagnosis.”
* * ■ ⅜ * ⅝ *
“Q. What about his recovery from the operation, doctor, did you feel he had recovered?
“A. At the time of my interview, I didn’t know which disc had been operated on, and so on, but I concluded that, if it is true that is the myelogram showed a ruptured disc, and that Dr. Unkauf operated on the disc, we could also postulate that the patient had made a reasonably good recovery and could work if he wanted to do so.”
******
“Q. What do you mean in your report when you say nearly twenty per cent of the patients who have a disc operation have a second disc operation months or years later?
“A. Well, those are not all the discs. It simply illustrates the fact that a disc operation isn’t a very good operation. A good operation which is one that corrects a condition, and keeps the condition from recurring. I simply want to point 'out that it isn’t unusual for the man who has a disc operation to continue to complain and perhaps have other operations.”
⅜ ⅜ ⅝» ⅜ ⅝ ⅜
“A. I think that I am safe to say that it is never one disc only that deteriorates, it is multiple.”
******
“A. Well, I would say that if a person had multiple degenerated discs which is usually the case, that if one injury causes fracture, rupture of a *78 most degenerated disc/and doesn’t do. anything to the other degenerated discs you have to wait for a second injury to rupture the second disc ■ that ruptures. You see how you can blame' further events on one injury.”
* ‡ * * * *
“Q. Normally, on an operation such as this, is there any disability resulting as a result of the operation in a successful operation?
“A. Yes, five percent is the disability rate on a completely successful disc operation, according to the regulations set up by the commission, appointed by the American Medical Society years ago. We follow it and it says that five percent disability should be given a completely successful operation.”
* . * ' * * * *
“Q. Dr. Echols, did you give this man a percentage disability?
“A. I didn’t want to, didn’t have occasion to. I would have had to give him the five percent.”
Dr. Unkauf, who performed both operations, testified Plaintiff was about S'% to 15'% disabled as a result of the injury and operation.
A 15% back injury to a common laborer who, as a plumber’s helper must climb, stoop and lift heavy objects, can very well involve a 100% disability because the law requires no one to work in-pain.
Defendants contend that in any event, Plaintiff is not entitled to total permanent disability benefits, but only to partial disability benefits under LSA-R.S. 23 :- 1331 (fixing compensation for specific injuries) since Plaintiff’s back is only 15% disabled. However, because of the character of Plaintiff’s common labor and his inability to work without pain, he is entitled to total and temporary compensation for inability to do work of the same or reasonable character. Bean v. Higgins, Inc., 230 La. 211, 88 So.2d 30; Monk v. Louisiana Forestry Commission, La.App., 124 So.2d 351.
In Morgan v. American Bitumuls Co., 217 La. 968, 47 So.2d 739, a laborer suffered 20% damage to his shoulder and was' allowed compensation for partial disability only as contended by Defendants here. However, in the cited case the injured laborer was performing similar labor and earning wages in an occupation he was engaged in before the injury to his shoulder. Plaintiff here is unable at this time to do work of a similar nature or character. That Plaintiff could drive his automobile and lift a small home garbage pail, is not work of a similar character.
Defendants contend the doctors testified Plaintiff was able to return- to work after the operation for injury to L^t; and that the injury to L-5 was not due to the initial injury, but to some other intervening cause. The medical testimony indicates that injury to one degenerated disc may result in injury to another.
An injury is compensable if an incident at work precipitates or accelerates a pre-existing predisposition or disease into becoming a present disability. Cutno v. Neeb Kearney & Company, 237 La. 828, 112 So.2d 628; Talbot v. Trinity Universal Insurance Company, La.App., 99 So.2d 811; Finn v. Delta Drilling Company, La.App., 121 So.2d 340; Monk v. Louisiana Forestry Commission, La.App., 124 So.2d 351.
Regarding contention Plaintiff’s incapacity is due to an injury to 1^5 and not L-4, the medical testimony is that an injury to one disc of a degenerated spine, and an operation thereon, may well inflame and activate another diseased, though dormant, disc. If so, compensation is payable. Estilette v. United States Fidelity & Guaranty Co., La.App., 64 So.2d 878.
Defendants further urge that, because of Plaintiff’s two previous injuries, one to a finger and one to a knee, for which he re *79 ceived compensation' settlements; and is now receiving $32.50 per week compensation and $155.00 per month public welfare payments, he has become a malingerer. We cannot agree. With a wife and seven minor children to support, such weekly and monthly receipts cannot go far to provide the necessities of life. Further, his ready willingness to submit to the two myelo-grams and the laminectomy, the latter of which he could have legally refused without prejudice, is the strongest evidence of his good faith.
Regarding the question of attorney’s fee and 12% penalty allowed under LSA-R.S. 22:658, where the insurer fails to make payment as required by law, and its failure is arbitrary, capricious or without probable cause, we do not think the facts of this case warrant such assessment. The insurer paid compensation for ' 96 weeks, and only discontinued such payments when their medical expert, a neurosurgeon of wide experience, advised that Plaintiff could resume his former work as a common laborer. We do not consider the case of Monk v. Louisiana Forestry Commission, La.App., 124 So.2d 351, cited by Plaintiff, to be all-squate with the facts here, but consider the case of Militello v. Bankers Life & Casualty Co., La.App., 141 So.2d 454, where penalties were disallowed, to be more in point.
For the reasons assigned, the judgment appealed from is affirmed in the award of compensation for temporary total disability; annulled insofar as it allows 12% penalty and attorney’s fee against Defendant-insurer; and amended to. allow Plaintiff’s attorney a fee under LSA-R.S. 23:-1141 (as amended by Act 496 of 1958), not to exceed 20% of the first $5000.00 and 10% of any award over $5000 00, to be deducted from the payments when due Plaintiff; Defendants-Appellants to pay all costs in both courts.
Judgment affirmed in part, annulled in part, and- ámended.